Milwaukee Cold Storage Co. vs. Dexter and another.

MILWAUKEE COLD STORAGE COMPANY, Appellant, vs. DEXTER and another, Respondents.

*March 4 — April 12, 1898.*

*Corporations: Fraud by promoters: Brief on appeal.*

1. One D., having purchased land, paid a part of the price, and bound himself to pay the balance and to build upon and carry on a certain business on the premises, organized a corporation to carry on that business, not having previously intended to do so, and sold the land to it at an advanced price. The subscribers for stock knew at what price it was to be purchased and had the means of knowing its value, but did not inquire what D. had paid for it, and were not influenced to purchase by any false statement or representation or any breach of duty or trust on his part. *Held,*

Milwaukee Cold Storage Co. vs. Dexter and another.

that the stockholders could not complain because of D.'s having charged the corporation more for the land than he paid for it. *Pittsburg Mining Co. v. Spooner*, 74 Wis. 307; *Franey v. Warner*, 96 Wis. 222; and *Fountain Spring Park Co. v. Roberts*, 92 Wis. 345, distinguished.

2. A statement in the prospectus for such corporation in the terms "Cost of ground, $40,000," cannot be construed as a representation that the land cost that sum to the stockholder who offered it to the corporation.

3. It cannot be construed as a fraud upon the corporation or upon the other subscribers that D., out of his own funds, paid to one of the subscribers a commission to induce him to subscribe or to procure others to do so, which would render D. and such other subscriber liable to the corporation for the profits made by them on the sale.

4. Neither was it a fraud upon the corporation that D., in order to induce his vendor, without whose consent he could not sell, to become a subscriber, personally paid him a sum of money.

5. D. did not, by purchasing land in his own name and offering to sell it to a corporation organized by him, become an agent or trustee of such corporation.

6. A brief in a case depending upon the evidence should, under Supreme Court Rule IX, merely state the leading facts and conclusions which the evidence establishes or tends to establish, with reference to the names of the witnesses and the places in the printed case where the evidence may be found.

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Affirmed.*

This action was commenced February 29, 1896, to recover from the defendants, *Dexter* and *Godfrey*, $18,187.50, with interest thereon from February 24, 1893, and to have the same declared to be a lien upon their shares of stock in the plaintiff company, and that the same be sold to satisfy the amount so found due to the plaintiff from them, or, on default, their stock, or so much thereof as may be necessary to satisfy such decree, be canceled, and that the plaintiff have judgment against them for any deficiency. The defendants separately answered by way of admissions, denials, and counter allegations.

The cause having been tried by the court, the facts found or proved and admitted are in effect as follows:

On April 15, 1892, Lindsay Bros. had possession of the land in question, under a land contract from the Milwaukee Land Company. On that day the defendant *Dexter* applied to Lindsay Bros. for the purchase of the land. They at first asked $30,000 for the land, but finally agreed orally to take $22,500 on the conditions stated in a written contract to be drawn therefor. The defendant *Dexter* then paid Lindsay Bros. $1,000, as a part of such purchase price. On April 17, 1892, he paid them thereon the further sum of $5,000. On April 20, 1892, such land contract from Lindsay Bros. was drawn up and executed by them to the defendant *Dexter*. Said contract is to the effect that Lindsay Bros., for and in consideration of $22,500 to be paid by the defendant *Dexter* as thereinafter specified, and the keeping of other promises, agreements, and stipulations by him therein made and contained, thereby agreed to convey a good title to the defendant *Dexter*, by warranty deed or deeds, to the real estate therein described, and further agreed to procure the construction of a suitable switch for the line of the Chicago, Milwaukee & St. Paul Railway Company on the right of way belonging to the company, so that the center of the track would be six feet east of the east line of the land described, and suitable for receiving and shipping merchandise from the building or buildings to be erected on said land. That in consideration of such agreements, the defendant *Dexter* did therein covenant and agree to purchase and pay for the land described $22,500, as follows, to wit: The $6,000 at the time of the execution and delivery of such agreement, and which had in fact already been paid, as mentioned, and $16,500 in six equal instalments of $2,750 each, payable on or before December 1 in each of the years 1892 to 1897, inclusive, with interest at six per cent. per

annum, payable annually, on the deferred payments; that the defendant *Dexter* did therein further covenant and agree that he would on or before December 10, 1893, improve the premises by erecting thereon substantial and new buildings, machinery, and outfits, and use the same until April 20, 1899, in conducting a cold storage business; that all such improvements should remain on the premises, and not be removed therefrom or destroyed until the final payment for the premises, and that he would promptly pay as so agreed, and would regularly pay all taxes and assessments, general or special, lawfully imposed upon the premises prior to the return thereof; that in case the defendant *Dexter* should fail to make the payments aforesaid, or any of them, punctually, or should fail to perform all of his agreements and stipulations aforesaid, strictly and literally (times of payment and performance being of the essence of the contract), then Lindsay Bros. were to have the right to declare the contract null and void, and all the rights and interests thereby created or then existing in favor of defendant *Dexter* should thereupon utterly cease and determine, and the premises, and the right to the possession thereof, should revert to and revest in Lindsay Bros. as absolutely, fully, and perfectly as if such contract had never been made; that the defendant *Dexter* did thereby covenant and agree that he would make no transfer of the contract, nor of his rights or interests in the premises, without the approval of Lindsay Bros.; that it was thereby further mutually covenanted and agreed that the covenants and agreements therein specified should be binding upon the successors, heirs, legal representatives, and assigns of the respective parties.

On April 20, 1892, the defendant *Dexter* entered into the possession of the real estate, and the several tenants occupying buildings on the premises thereafter attorned and paid rent therefor to him. The defendant *Dexter* was then, and

had been for a long time prior thereto, engaged in the business of cold storage warehousing at Whitewater, and the same had been very profitable.  He was also the inventor of certain devices used in such business, and the owner of letters patent on the same, and had for a long time theretofore been engaged in the business of erecting and constructing cold storage warehouses, upon contract, for others.  Such real estate was not purchased by the defendant *Dexter* for or on behalf of the plaintiff corporation, nor with the intention of turning the same over to, or disposing of the same in any manner to, the plaintiff or any corporation.  He first conceived the idea of forming a corporation for the purchase of the land in question from himself, and the carrying on upon the land the business of cold storage warehousing, May 5, 1892; and prior to that date neither of the defendants did anything looking towards the formation of the plaintiff corporation, or any other corporation, and did not consult any person relative to the formation of the corporation, or ask any person to become in any way interested therein.  The defendant *Dexter* so purchased the land from Lindsay Bros. for the purpose of building and operating thereon a cold storage warehouse himself; but after failing to dispose of some other property owned by him from which he hoped and expected to secure funds necessary for that purpose, he, on May 5, 1892, proposed to the defendant *Godfrey,* who carried on a large commission business in Milwaukee, and whose patronage of such cold storage warehouse would add much to the probable success of the enterprise, that a corporation be formed, with a capital stock of $100,000, to take from the defendant *Dexter* the land, at and for the sum of $40,000, and build and operate a cold storage warehouse thereon; that he (the defendant *Dexter*) would subscribe for $60,000 of such capital stock; that in case he (the defendant *Godfrey*) would give his own sub-

scription, or procure the subscription of other commission men, together with his own, to the remaining $40,000 in capital stock, he (the defendant *Dexter*) would pay him (*Godfrey*) for such services in obtaining such subscriptions, and also to induce the defendant *Godfrey* to become such stockholder and thus secure his valuable patronage for such warehouse business, the sum of $4,000. No part of the $4,000 was added to the purchase price which the projected corporation was to pay for the land, but was to be paid by the defendant *Dexter*, out of his own money, to the defendant *Godfrey*, for the consideration aforesaid; and the purpose thereof was to aid the projected business in the manner aforesaid.

After May 5, 1892, the defendant *Dexter* also solicited E. J. Lindsay, of the firm of Lindsay Bros., to subscribe for and take stock in the plaintiff corporation for the purpose of purchasing the land at $40,000. Said Lindsay subscribed for and agreed to take fifty shares of the stock and pay therefor $5,000. Some time after such subscription said Lindsay claimed that, under the circumstances of the recent sale of the land by Lindsay Bros. to the defendant *Dexter* at such reduced price, he thought it was unfair to charge him for his interest at so high a price. Thereupon the defendant *Dexter* thought he would make it right, and afterwards gave him his check for $550,— that is to say, to charge him for his interest at the rate of $30,000 for the land, the price first exacted by Lindsay for the land. Both the defendant *Godfrey* and Lindsay subscribed for stock in the plaintiff corporation prior to June 4, 1892.

Articles of incorporation of the plaintiff were executed May 7, 1892, and filed and recorded, as required by law, May 9, 1892. At the time the first meeting of the corporation was held for the purpose of organization (June 4, 1892), and prior to and at that time, the following persons had sub-

scribed to the stock of the corporation, and agreed to take and pay for the number of shares set opposite their names, as follows:

| | | | |
|---|---|---|---|
| A. I. Dexter | 500 shares | | $50,000 |
| E. R. Godfrey | 160 " | | 16,000 |
| E. R. Godfrey, Jr. | 40 " | | 4,000 |
| W. H. Stevens | 20 " | | 2,000 |
| I. P. Tichenor | 20 " | | 2,000 |
| N. L. Kneeland | 20 " | | 2,000 |
| G. C. Rogers | 20 " | | 2,000 |
| E. K. Dexter | 50 " | | 5,000 |
| E. J. Lindsay | 50 " | | 5,000 |
| Making an aggregate of | 880 " | amounting to | $88,000 |

Up to that time no other person had subscribed for such stock. Between May 7 and May 9, 1892, a prospectus of such proposed corporation was prepared by the defendant *Dexter*, to be presented to, and which was in fact presented to, each of the persons so subscribing for such stock, before making such subscription. Such prospectus stated, among other things, that the proposition was for the *Milwaukee Cold Storage Company* to have capital stock to the amount of $100,000; that the value of the capital stock to be so issued would be $55,000; that a mortgage bond would be given for $45,000; that the cost of the ground would be $40,000; that the cost of building and fittings would be $60,000.

Each one of the persons so subscribing knew that the land in question belonged to the defendant *Dexter;* that *Dexter* was not purchasing, and had not purchased, the land for the projected corporation. Each one of the foregoing persons signed the subscription to the stock with the understanding that, as to him, such property should be purchased by the plaintiff corporation from the defendant *Dexter* for $40,000, but without knowledge of, and without inquiry as to, what the property cost the defendant *Dexter*, except that the defendant *Dexter* and said Lindsay had such knowl-

edge, and the defendant *Godfrey* and said Lindsay each had knowledge of the payments to be made to him as aforesaid. Said *Godfrey* had reason to believe, and did believe, that the defendant *Dexter* was selling the land to the corporation for more than it cost him, though he did not know, and never inquired, what *Dexter* had paid, or agreed to pay, for the land, nor what profit he was making, and *Dexter* never told him.

At the first meeting, for the purpose of organizing the plaintiff corporation by the election of officers and the acceptance of stock subscriptions, June 4, 1892, there were present the subscribers for stock mentioned, and it was then and there voted that the plaintiff purchase the land in question for $40,000. The defendants. *Godfrey* and *Dexter*, and also said Lindsay, with the other subscribers, attended at such meeting. Each of such nine subscribers subscribed with the understanding and agreement that the land in question should be bought by the plaintiff from the defendant *Dexter* for $40,000. Neither the defendants *Godfrey* or *Dexter* nor said Lindsay in any way acted for the plaintiff or its subscribers, as agent to negotiate or make the purchase of said land for it or them, except by joining in the vote aforesaid. Such purchase by the plaintiff of the land in question from the defendant *Dexter* was authorized by a resolution passed by its board of directors. At the time of the passage of such resolution and sale of the land, the defendants, *Dexter* and *Godfrey*, and said Lindsay, were acting directors, and then constituted a majority of such board. The defendant *Dexter* was then acting as president thereof, and the defendant *Godfrey* as the treasurer thereof. The defendant *Dexter* did not at any time disclose to the other subscribers what the land cost him, nor what profit he was making in turning the land over to the plaintiff, but never made to any of them any misstatement or misrepresentation whatever about the same.

Milwaukee Cold Storage Co. vs. Dexter and another.

The defendant *Godfrey* did not disclose to any of the other subscribers that he was to receive $4,000 from *Dexter*. Lindsay did not disclose to any of the other subscribers that he had received $550 from *Dexter*. Each of the subscribers, excepting *Dexter*, *Godfrey*, and Lindsay, was ignorant of the amount of profit made by *Dexter*, the money so agreed to be paid by him to *Godfrey*, and the rebate paid by him to Lindsay, but the land was a known piece of property in the city of Milwaukee, and each of the subscribers knew the price asked, and knew, or could have ascertained, the condition and value of the land, and each agreed that the said land be taken by such corporation at the price aforesaid, without regard to what it might have cost *Dexter*, and without regard to what it might have cost any other subscriber for his subscription to the capital stock of the corporation.

Subsequently to June 4, 1892, Carrie W. Thayer subscribed for twenty shares of such stock, F. W. Wyman subscribed for twenty shares, Thomas & Schaus subscribed for twenty shares, A. B. Meyer subscribed for twenty shares, and William Plankinton subscribed for forty shares, of the plaintiff's stock, which, with the 880 shares obtained on and prior to June 4, 1892, made 1,000 shares; being the whole capital stock of the corporation. The subscriptions after June 4, 1892, were obtained by *E. R. Godfrey*, and each one of the subscribers last referred to knew that the land in question had been purchased by the corporation for $40,000, before subscribing, and subscribed with that understanding and on that basis, and without being led or induced to do so by any false statement or representation whatever. There was no intention to defraud the plaintiff, or any of the subscribers to its capital stock, by the defendants, or either of them, in any or either of the transactions mentioned. All persons who subscribed for stock in the corporation did so without relying on what others were paying, or what the land had cost any purchaser prior to its purchase by the

corporation.   No proof was offered by the plaintiff, nor is in any way before the court, that the land was worth less than $40,000 when it was bought by the corporation from *Dexter*, nor that at the time of the trial it was worth less than that sum.

On January 30, 1893, the Milwaukee Land Company conveyed the premises to Lindsay Bros. by deed dated on that day, reciting a consideration of $10,000, and the same was recorded February 16, 1893.   Lindsay Bros. conveyed the same to the defendant *Dexter* by deed dated February 15, 1893, and recorded February 24, 1893, reciting a consideration of $25,000.   The defendant *Dexter* and wife conveyed the same to the plaintiff by deed dated February 15, 1893, and recorded February 24, 1893, reciting a consideration of $40,000.   The plaintiff corporation made calls on its subscribers to pay in their subscriptions to the capital stock;— one of ten per cent., June 4, 1892; one of twenty per cent., October 29, 1892; one of ten per cent., December 13, 1892; one of ten per cent., January 14, 1893; and one of ten per cent., May 6, 1893; making sixty per cent. in all,— and such calls were paid, and the plaintiff erected and completed a cold storage warehouse on the land in question, and began and was engaged in carrying on the business of warehousing thereon in May, 1893.   The plaintiff had in January, 1893, procured a loan of $40,000, secured by mortgage on the land in question so improved, and out of the proceeds of the loan paid the balance due to the defendant *Dexter* on the land in question.

On May 17, 1893, and after sixty per cent. had been paid in on such capital stock subscription, one John A. Hill and his father, Robert Hill, began negotiations for the purchase of 350 shares of stock in the plaintiff corporation, and June 3, 1893, an arrangement was made whereby the defendants, *Dexter* and *Godfrey*, and also Thomas & Schaus, E. J. Lindsay, W. H. Stevens, and G. C. Rogers, relinquished each a

part of his subscription aforesaid, amounting to 350 shares in all, and said John A. Hill came in as a stockholder, although making no formal subscription, and paid into the treasury of the plaintiff at the rate of $102.50 per share for said 350 shares of stock, and received said stock from the plaintiff corporation; and subsequently the said John A. and Robert Hill purchased from the other subscribers aforesaid other stock in the plaintiff corporation, until said John A. and Robert Hill at the time of the trial owned all of the stock in the plaintiff corporation, except thirty shares owned by the defendant *Godfrey*, and 290 shares by the defendant *Dexter* and his wife. Part of the stock so acquired by John A. and Robert Hill was 130 shares, which they held as the transferees of the defendant *Godfrey*, 50 shares as the transferees of the said E. J. Lindsay, and 210 shares as the transferees of the defendant *Dexter*, and the remainder of the stock so held by John A. and Robert Hill was so held by them as transferees of the subscribers aforesaid, who acquiesced in the purchase of the property as stated. The shareholders of the corporation at the time this action was commenced, and at the time of the trial, were: *E. R. Godfrey*, 30 shares; the defendant *Dexter* and wife, 290 shares; and John A. and Robert Hill, 680 shares. By subsequent corporate action, without the consent of the defendants, the plaintiff corporation reduced its capital stock, first to $80,000, by making the par value of each share $80, instead of $100, and later, and since the commencement of this action, reduced its capital stock to $50,000, by making the par value of each share $50, instead of $80.

The $4,000 so paid by the defendant *Dexter* to the defendant *Godfrey*, and the $550 so paid by the defendant *Dexter* to Lindsay, were so paid and received, in good faith, out of the funds of the defendant *Dexter*, and not out of the corporate funds or property belonging to the plaintiff, and the payment thereof was fairly compensated by the advantage

derived by the corporation and its then subscribers on account of such payment, and there was never any agreement or representation to the said subscribers, or either of them, that they, or either of them, were getting their stock in the corporation upon the same terms as all the other subscribers, nor were there any misrepresentations whatever made to any of the subscribers, nor to the said John A. Hill, nor to Robert Hill, at the time he purchased it, in June, 1893, or prior thereto, or at any time; nor were the payments by *Dexter* to *Godfrey* or Lindsay, or either of them, or any part of either of them, added to the purchase price of said property paid by the plaintiff corporation, nor was the said purchase price in any way or to any extent increased or enhanced thereby; and there was no evidence before the court that the plaintiff corporation had suffered any damage or injury whatever by reason of any act or thing done by the defendants, or either of them.

As conclusions of law upon the facts stated, the court found that the plaintiff could not maintain this action, and that the defendants were entitled to judgment dismissing the complaint herein, and for their costs and disbursements, and ordered judgment to be entered accordingly.

From the judgment so entered the plaintiff brings this appeal.

For the appellant there was a brief by *Quarles, Spence & Quarles*, and oral argument by *Charles Quarles*. They argued that the defendant *Dexter* was bound, as a promoter, to state all the facts. Bishop, Contracts, § 660. Actual fraud resulted from defendants' acts, and it was immaterial that none was intended. *Chandler v. Bacon*, 30 Fed. Rep. 538. *Dexter* and his associates were liable as promoters. 2 Cook, Stock, § 651; 1 Thompson, Corp. § 415; *Pittsburg Mining Co. v. Spooner*, 74 Wis. 307; *Hebgen v. Koeffler*, 97 id. 313; *Erlanger v. New Sombrero P. Co.* 3 App. Cas. 1218, 6 Eng. Rul. Cas. 777. They were liable as trustees of the

Milwaukee Cold Storage Co. vs. Dexter and another.

corporation. *In re Taylor Orphan Asylum,* 36 Wis. 535; *Haywood v. Lincoln L. Co.* 64 id. 647; *Parker v. Nickerson,* 112 Mass. 195; *Michoud v. Girod,* 4 How. 503; *Bentley v. Craven,* 18 Beav. 75; *Franey v. Warner,* 96 Wis. 222.

For the respondents there was a brief by *Van Dyke & Van Dyke & Carter;* a separate brief by *Timlin & Glicksman,* attorneys for *Godfrey;* and oral argument by *W. E. Carter* and *W. H. Timlin.*

CASSODAY, C. J. The facts stated are either conceded, or found by the court to be true, and the evidence is sufficient to support the findings. Upon such facts, therefore, the rights of the parties must be determined. Counsel for the plaintiff seek to bring the case within the rulings of this court in *Pittsburg Mining Co. v. Spooner,* 74 Wis. 307; *Fountain Spring Park Co. v. Roberts,* 92 Wis. 345; *Franey v. Warner,* 96 Wis. 222; *Hebgen v. Koeffler,* 97 Wis. 313. In the first of these cases the rule of law applicable was tersely stated in a quotation from the opinion of a court in another jurisdiction, as follows: "A trustee or agent cannot purchase on his own account what he sells on account of another, nor purchase on the account of another what he sells on his own account; . . . and, if he does so, the *cestui que trust* or principal, unless, upon the fullest knowledge of all the facts, he elects to confirm the act of the trustee or agent, may repudiate it, or he may charge the profits made by the trustee or agent with an implied trust for his benefit." 74 Wis. 320. In the second case cited it was held that the "promoters of a corporation are accountable to it for any profits which they may receive from a violation of their duty as such." In all of them the persons held liable were promoters of the corporation, or the contemplated corporation, in the purchase and sale of the lands, or agents or trustees of such corporation in making such purchase or sale, or both. This is not such a case.

The defendant *Dexter* had closed his contract for the purchase of the land from Lindsay Bros., and paid $6,000 of the purchase price thereon, more than two weeks before the time when anything was said about, or done towards, the formation of the plaintiff corporation. That contract bound the defendant personally to erect and construct the buildings, machinery, and outfits necessary for the cold storage business, and to operate the same for seven years, and to pay the balance of the contract price as agreed, and not to transfer the contract, nor his right in the premises, without the approval of Lindsay Bros. We must therefore consider the land as the property of the defendant *Dexter* at the time the formation of the plaintiff corporation was first contemplated by him. His original purpose of constructing such cold storage buildings, machinery, and outfits himself, and then to operate the same for the period mentioned, was apparently changed by extraneous circumstances into a purpose of doing the same through a corporation in which he and his wife should own at least a majority of the stock.

His prospectus for such corporation stated, "Cost of ground, $40,000." It is contended that this was a representation to the contemplated subscribers for stock that the land had actually cost him that amount. A prospectus is naturally supposed to be prospective in its application. In the instant case it was the summary or outline of the plan or scheme for the proposed cold storage undertaking. The $40,000 named was manifestly to be the cost of the ground to the proposed corporation, not the amount which it may have cost the defendant *Dexter*, or some prior purchaser.

It is contended that, because the defendant *Dexter* purchased the land of Lindsay Bros. for $22,500, it was only worth that amount. But Lindsay Bros. had other real estate in the vicinity, and the conditions exacted by them from the defendant *Dexter* in the contract, to construct and operate such cold storage plant thereon, may have been regarded as

a great advantage to them, and as a sufficient inducement to accept for the land $7,500 less than at first exacted. The location of the land may have been such as to make it of much more value for the purposes of such cold storage business than for any other use. There is no evidence in the record as to the value of the land at the time of the incorporation of the plaintiff, except such inferences as may be drawn from the contract price and the price exacted.

It is true that the defendant *Dexter* did not disclose to any of the subscribers to the stock in the plaintiff corporation the amount which he had agreed to pay Lindsay Bros. for the land, and none of them knew, except E. J. Lindsay, and the defendant *Godfrey* had reason to believe that he was to receive more from the corporation than he had agreed to pay; but none of them made any inquiry, and it does not appear that any false statement or misrepresentation was made by *Dexter* to any one. The land was open and visible, and well known to all the subscribers; and each knew the price which the plaintiff was to pay for the same, and each knew, or could have ascertained, the condition and value of the land at and prior to the time of subscribing for such stock. The defendant *Dexter* had large experience in the business of cold storage warehousing, and owned letters patent on certain devices used in such business, and manifestly believed it would become a profitable enterprise. Since the defendant *Dexter* had obtained the land, and paid more than one fourth of the purchase price, weeks before there was anything said or done, or apparently contemplated, about the formation of the plaintiff corporation, and since the several stockholders subscribed with such knowledge or means of knowledge in respect to the value of the land and the price the plaintiff was to pay for the same, and without being influenced by any false statement or misrepresentation, and without any breach of duty or trust on the part of the defendants or either of them, there seems to be no founda-

Milwaukee Cold Storage Co. vs. Dexter and another.

tion for claiming that the plaintiff, or any subscriber to its capital stock, was defrauded or injured, merely because the defendant *Dexter* personally paid to the defendant *Godfrey* $4,000, to induce him, as a commission man, to subscribe, or procure the subscription of other commission men, for the balance of the $100,000 capital stock in order that the plaintiff might secure the valuable patronage of such commission men in the proposed cold storage business; nor because the defendant *Dexter* personally paid to E. J. Lindsay, after his subscription to the stock, $550, in order to remove his apparent dissatisfaction for having sold the land so cheaply,— especially as the contract precluded *Dexter* from transferring the same to the plaintiff or any one, without the approval of Lindsay Bros.

The question recurs whether the plaintiff is entitled to recover from the defendants, or either of them, upon the facts stated. Certainly there is nothing said in any of the cases cited above to warrant a recovery in such a case as this. In fact, the intimation in some of those cases is strongly to the contrary. Thus, in *Franey v. Warner*, 96 Wis. 222, Mr. Justice MARSHALL said: "Cases cited, where a person sells his own property to a company in which he is interested, at an increased price, fairly and openly, free from representations that he is selling the property of another, have no application to this case." Numerous adjudications are there cited in support of that proposition, and it seems to be applicable to the case at bar. In the language of Mr. Justice SHARSWOOD in *Densmore Oil Co. v. Densmore*, 64 Pa. St. 49: "Any man, or number of men, who are the owners of any kind of property, real or personal, may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there be no fraudulent misrepresentation made by the vendors to their associates. They are not bound to disclose the profit which they may realize by the transaction."

Milwaukee Cold Storage Co. vs. Dexter and another.

The defendant *Dexter* was not the agent or trustee of the plaintiff or any one at the time he obtained the land of Lindsay Bros. *Id.* Neither of the defendants stood in any confidential relation to any of the subscribers to the capital stock until some step was taken towards the formation of the plaintiff corporation. These views are supported by *In re Cape Breton Co.* 29 Ch. Div. 795; *Ladywell Mining Co. v. Brookes*, 35 Ch. Div. 400; *S. C.* 17 Am. & Eng. Corp. Cas. 22. Thus, in the recent case in the house of lords the lord chancellor, HERSCHELL, said: "It is of the very essence of such a case as this to show that the price at which the property was sold to the company was in excess of what has been called the real price, or the true value. . . . I admit that there may be considerable ground for suspicion that the price was in excess of it. But, obviously, for such a case as the appellant seeks to make out here much more than that is necessary. It is of the very essence of the case, which rests upon his proving what he claims, namely, a secret profit improperly made, that he should prove that there has been that excess which he alleges." *Bentinck v. Fenn*, 12 App. Cas. 659. There is nothing in the celebrated case of *Erlanger v. New Sombrero Phosphate Co.* 3 App. Cas. 1218, in conflict with the principles stated. That case is clearly distinguishable from the one at bar upon its facts, but the principles which govern this case are recognized in that. Upon the facts found or admitted, the trial court properly held that this action could not be maintained.

The brief and supplement on the part of the defendant *Dexter* cover 135 printed pages, and are in violation of the rules of this court. If the printed case is incomplete or inaccurate in any substantial particular (but not otherwise), the opposite party may serve a supplemental case with references to the record, as in the principal case, making the corrections; but no costs shall be taxed for the printing of any case or supplemental case failing to comply with the

rule. Rule VIII. "The brief .of the appellant or plaintiff
in error must contain a *concise* statement of (1) the nature
of the action and the issues involved; (2) the result of the
trial or hearing in the court below; (3) the several errors
relied upon for reversal; (4) in cases depending upon the
evidence, the leading facts or conclusions which the evidence
establishes or tends to prove; (5) the principles of law appli-
cable to the case, and the authorities in support of the
same." Rule IX. "The leading facts or conclusions which
the evidence establishes or tends to prove" does not mean a
recital or restatement of the evidence, but merely that such
facts or conclusions should be stated, with a reference to the
names of the witnesses and the places in the printed case
where the evidence which establishes or tends to prove such
facts or conclusions may be found. The rule prohibits ex-
tended discussion upon a mere question of fact in any brief.
To reprint in a brief what is printed in the case merely in-
cumbers the record and increases the expense, without being
helpful to the court. A party failing to comply with the
rules takes the chances of losing costs. The defendant *Dex-
ter* is only to be allowed for fifty pages of printed brief.

*By the Court.*— The judgment of the superior court of
Milwaukee county is affirmed.

As to the duties and liabilities of promoters to the corporation and
to its members, see note to *Yale Gas Stove Co. v. Wilcox* (64 Conn. 101),
in 25 L. R. A. 90.— REP.